T.C. Memo. 1999-296


UNITED STATES TAX COURT


ROBERT JOHN KAYIAN, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

NICHOLAUS M. KAYIAN, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6431-96, 11210-96.   Filed September 3, 1999.


<u>Geoffrey Todd Hodges</u>, for petitioners.

<u>Randall B. Pooler</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:   In separate notices of transferee liability (notices), respondent determined that petitioner Robert John Kayian (Robert Kayian) and petitioner Nicholaus M. Kayian (Nicholaus Kayian) are liable as transferees in amounts not ex-

ceeding $10,933 and $8,200, respectively, plus interest thereon as provided by law, for the unpaid Federal income tax (tax) liability of Harry K. Kayian, Sr. (Mr. Kayian, Sr.) for 1987, 1988, and 1989 in the amounts of $1,503, $18,959, and $26,442, respectively, plus interest thereon as provided by law (Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability).[1]  We must decide whether those determinations should be sustained.  We hold that they should.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time Robert Kayian filed his petition in this case, he resided in Brandon, Florida.  At the time Nicholaus Kayian filed his petition in this case, he resided in Tampa, Florida.

Mr. Kayian, Sr., who died intestate on August 17, 1993, after a long illness, was the father of petitioner Robert Kayian, Harry Kayian, Jr. (Mr. Kayian, Jr.), Kenneth V. Kayian, Richard H. Kayian, and Karen Kayian Aubel and the grandfather of petitioner Nicholaus Kayian, Kenneth J. Kayian-Beck, and Kaitlynn E. Kayian.  Mr. Kayian, Jr. is the father of Nicholaus Kayian.

In September 1989, Mr. Kayian, Sr., who had been married to Beatrice L. Kayian (Beatrice Kayian), met Nancy Livingston f/k/a

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Nancy Kayian (Ms. Livingston), and they were married in 1990. Mr. Kayian, Jr. did not like Ms. Livingston, who was only a few years older than he was, and was suspicious of her intentions in marrying his father. After Mr. Kayian, Sr. married Ms. Livingston, the relationship of Mr. Kayian, Jr. with his father changed in that, inter alia, Mr. Kayian, Jr. never had the opportunity to be alone with him.

From sometime in 1990 until mid-March 1991, Mr. Kayian, Sr. and Ms. Livingston lived in Aruba in housing provided by a resort for which Mr. Kayian, Sr. was selling time-shares. In mid-March 1991, Mr. Kayian, Sr. and Ms. Livingston moved from Aruba to Key West, Florida (Key West), where they lived until July of that year. In July 1991, they moved from Key West to Tampa, Florida (Tampa), where they purchased a residence. Mr. Kayian, Sr. had the title of that Tampa residence placed solely in the name of Ms. Livingston in an attempt to preclude the Internal Revenue Service (the Service) from using it in order to satisfy any outstanding tax liability that he had.

Sometime while Mr. Kayian, Sr. and Ms. Livingston were living in Aruba, Mr. Kayian, Sr. acquired bearer bonds issued by Natex Investments A.V.V. (Aruba bonds). After they returned to the United States, Mr. Kayian, Sr. and Ms. Livingston received statements with respect to those bonds on a regular basis. During 1992 and 1993, the balance shown on those statements,

which included accrued interest, was as high as $99,000. Around August 1992, Mr. Kayian, Sr. began receiving monthly payments with respect to the Aruba bonds.

Mr. Kayian, Sr. and Ms. Livingston did not file any tax returns (returns) while they were living in Aruba. As of January 1992, Mr. Kayian, Sr. had not filed returns for taxable years 1986 through 1990. Nor had he made any estimated tax payments during 1985 through 1990 or thereafter during 1991 and 1992.

Because the Service's records showed that substantial amounts of income had been reported to the Service as having been paid to Mr. Kayian, Sr. during 1987 through 1989 and that Mr. Kayian, Sr. should have filed returns for those years, revenue officer John Shatraw (Mr. Shatraw) of the Service's collection division was assigned to investigate and to issue a summons with respect to those delinquent returns. In early February 1992, Mr. Shatraw served a summons (summons) on Mr. Kayian, Sr. to compel him to produce the books and records necessary to prepare and file his returns for 1987 through 1989.

Mr. Kayian, Sr. had not filed his returns for 1987, 1988, and 1989 prior to February 26, 1992, when he and Mr. Kayian, Jr. met with Mr. Shatraw about the summons (February 26, 1992 meeting). Nor did he bring those returns to that meeting. Mr. Kayian, Sr. disclosed to Mr. Shatraw at the February 26, 1992 meeting that he had throat cancer and requested additional time

within which to prepare and file his returns for 1987, 1988, and 1989.  Mr. Shatraw granted Mr. Kayian, Sr.'s request.

Mr. Kayian, Jr. recommended to Mr. Kayian, Sr. that he retain a return preparer to assist him in the preparation of his delinquent returns.  Mr. Kayian, Jr. referred Mr. Kayian, Sr. to Ashley Lanier (Mr. Lanier), a certified public accountant since 1960 who had extensive experience in the preparation of returns and whom Mr. Kayian, Jr. was using as his return preparer.  Mr. Kayian, Sr. retained Mr. Lanier and met with him on several occasions as part of Mr. Lanier's efforts to obtain from Mr. Kayian, Sr. information, including information about any interest and other income that Mr. Kayian, Sr. received, that Mr. Lanier needed in order to prepare Mr. Kayian, Sr.'s returns for 1987, 1988, and 1989 and joint returns of Mr. Kayian, Sr. and Ms. Livingston for 1990 and 1991.  Mr. Kayian, Jr. was present at two of those meetings.  Mr. Kayian, Sr. never disclosed to Mr. Lanier that he owned the Aruba bonds or that he received interest income from those or any other bonds.

On March 2, 1992, March 30, 1992, and April 13, 1992, respectively, Mr. Kayian, Sr. filed the returns for 1987, 1988, and 1989 that Mr. Lanier had prepared for him.  Each of those returns showed that tax was due.  Respondent assessed the tax shown due in those returns, plus applicable additions to tax and interest, on May 4, 1992, May 18, 1992, and June 1, 1992, re-

spectively.  On June 5, 1992, and July 7, 1992, respectively, Mr. Kayian, Sr. and Ms. Livingston filed joint returns for 1990 and 1991 that Mr. Lanier had prepared for them.  Each of those returns showed tax due.  (We shall sometimes refer to the tax liabilities, including applicable additions to tax and interest, of Mr. Kayian, Sr. (1) for the years 1987 through 1989 as 1987 through 1989 tax liability and (2) for the years 1987 through 1991 as 1987 through 1991 tax liability.)

Mr. Kayian, Sr. did not pay his 1987 through 1991 tax liability when he filed returns for those years.  Consequently, Mr. Shatraw turned his attention to the collection of that tax liability.  In order to determine the financial ability of Mr. Kayian, Sr. to pay his 1987 through 1991 tax liability, Mr. Shatraw asked Mr. Kayian, Sr. to complete and submit Form 433-A, Collection Information Statement for Individuals.  The Service uses Form 433-A to obtain financial information (e.g., income, assets, and liabilities) regarding a taxpayer, on which the investigating revenue officer can rely in making a determination about a taxpayer's ability to pay tax due.

On or about March 22, 1992, Mr. Kayian, Sr. submitted a completed Form 433-A to Mr. Shatraw, which he signed under penalties of perjury (Mr. Kayian, Sr.'s Form 433-A).  Mr. Lanier was not actively involved in the preparation or submission of that form.  In Mr. Kayian, Sr.'s Form 433-A, Mr. Kayian, Sr.

indicated, inter alia, (1) that he maintained an IRA with Jackson National Insurance Company (Jackson National),[2] but he did not indicate the balance in that account; (2) that he owned two condominium units in Key West (Key West condominiums), in which he had equity totaling $42,775; (3) that he did not own any life insurance policies; (4) that he owned mortgage notes receivable worth $120,000 on certain time-share units (time-shares); (5) that he anticipated an increase in his income; (6) that he was involved in court proceedings regarding alimony; (7) that he had owned another condominium unit in Key West which had been re-possessed; and (8) that he had not made any recent transfers of assets for less than full value. Mr. Kayian, Sr. did not dis-close the Aruba bonds in the Form 433-A that he completed and submitted to Mr. Shatraw. Nor did he disclose in that form that he maintained with Continental Life & Accident Company (Con-tinental) an annuity contract (Continental annuity contract) and a separate group life insurance policy (Continental group life insurance policy).

In determining the potential to collect Mr. Kayian, Sr.'s 1987 through 1991 tax liability, Mr. Shatraw relied on Mr.

---

[2]Although not altogether clear from the record, it appears that the IRA with Jackson National to which Mr. Kayian, Sr. was referring consisted of an annuity contract that he had purchased from Jackson National on Apr. 15, 1988 (Jackson National annuity contract).

Kayian, Sr.'s Form 433-A, although he attempted to verify the accuracy and completeness of that form and made a few notations on that form based principally on his discussions with Mr. Kayian, Sr. Since certain assets that Mr. Kayian, Sr. listed in that form were located in the vicinity of Miami, Florida (Miami), Mr. Shatraw contacted the Miami office of the Service's collection division for assistance in verifying Mr. Kayian, Sr.'s Form 433-A. However, that office was unable to provide any assistance to Mr. Shatraw because its operations were temporarily affected due to Hurricane Andrew.

Mr. Kayian, Sr. never disclosed to Mr. Shatraw or other personnel of the Service that he owned the Aruba bonds, and it would have been almost impossible for the Service to discover such an offshore asset. If Mr. Kayian, Sr. had informed Mr. Shatraw about those Aruba bonds, Mr. Shatraw would have required Mr. Kayian, Sr. to liquidate those bonds and apply the bond proceeds toward satisfaction of his 1987 through 1989 tax liability.

Mr. Kayian, Sr. consistently represented to Mr. Shatraw that he intended to pay in full his 1987 through 1989 tax liability. Between April 13, 1992, and August 5, 1992, Mr. Kayian, Sr. made payments to the Service totaling approximately $16,735 that the Service credited to his tax liability for 1987. Mr. Kayian, Sr.

obtained approximately $13,000 of those payments by liquidating certain assets listed in Mr. Kayian, Sr.'s Form 433-A.

On July 20, 1992, due to the failure of Mr. Kayian, Sr. to pay in full his 1987 through 1989 tax liability, the Service recorded a notice of Federal tax lien in an amount totaling $68,243.27 in Hillsborough County, Florida. Mr. Kayian, Sr. made no further payments of his outstanding tax liability after August 5, 1992.

At some time between July 20, 1992, and September 4, 1992, the collection of Mr. Kayian, Sr.'s 1987 through 1991 tax liability was transferred to revenue officer Claude A. Stephens (Mr. Stephens). On September 4, 1992, Mr. Stephens sent Mr. Kayian, Sr. a final notice of intention to levy with respect to the respective taxes that were shown due in the 1990 and 1991 joint returns that Mr. Kayian, Sr. and Ms. Livingston had submitted to the Service.

Through at least November 9, 1992, Mr. Stephens communicated with Mr. Lanier with respect to, inter alia, the assets and liabilities listed in Mr. Kayian, Sr.'s Form 433-A. The information that Mr. Lanier provided to Mr. Stephens during those communications was based solely on information that Mr. Lanier had obtained from Mr. Kayian, Sr. Mr. Stephens was never made aware of the existence of the Aruba bonds that Mr. Kayian, Sr. owned.

In addition to his discussions with Mr. Lanier about Mr. Kayian, Sr.'s tax situation, Mr. Stephens performed an independent investigation to determine whether the information contained in Mr. Kayian, Sr.'s Form 433-A was accurate and complete. As part of Mr. Stephens' investigation of Mr. Kayian, Sr.'s financial situation, Mr. Stephens did not locate any assets owned by Mr. Kayian, Sr. that were not shown in Mr. Kayian, Sr.'s Form 433-A. However, it would have been almost impossible for the Service to discover offshore assets, such as the Aruba bonds.

On or about November 9, 1992, Mr. Stephens made handwritten notations on Mr. Kayian, Sr.'s Form 433-A to update it, including one notation which corrected a notation that Mr. Shatraw had made on that form regarding ownership of one of the Key West condominiums that Mr. Kayian, Sr. listed therein. After the updates that Mr. Shatraw and Mr. Stephens made to Mr. Kayian, Sr.'s Form 433-A, that form indicated, inter alia, (1) that Mr. Kayian, Sr.'s monthly expenses exceeded his monthly income by $588 and (2) that the mortgage notes which Mr. Kayian, Sr. owned on certain time-shares had a value of $60,000.

At some undisclosed time after Mr. Kayian, Sr. submitted to the Service the returns for 1987 through 1991 that Mr. Lanier had prepared, Mr. Lanier indicated to Mr. Kayian, Sr. that, in light of the total amount of his 1987 through 1991 tax liability and Mr. Lanier's understanding of Mr. Kayian, Sr.'s limited re-

sources, Mr. Kayian, Sr. should consider submitting offers-in-compromise with respect to that tax liability. Because Mr. Kayian, Sr. was not familiar with an offer-in-compromise, Mr. Lanier explained to him what such an offer is. In recommending to Mr. Kayian, Sr. that he consider submitting an offer-in-compromise and in preparing separate offers-in-compromise with respect to Mr. Kayian, Sr.'s 1987 through 1989 tax liability and Mr. Kayian, Sr. and Ms. Livingston's joint tax liability for 1990 and 1991 (joint 1990 and 1991 tax liability), Mr. Lanier relied on the information provided to him by Mr. Kayian, Sr. about his assets and did not independently verify that information. At no point did Mr. Kayian, Sr. divulge to Mr. Lanier that he owned the Aruba bonds or any other bonds. If Mr. Kayian, Sr. had informed Mr. Lanier about the Aruba bonds, Mr. Lanier would have disclosed that information to the Service, and it would have impacted Mr. Lanier's preparation of offers-in-compromise for Mr. Kayian, Sr.

On December 7, 1992, Mr. Kayian, Sr. signed, under penalties of perjury, an amended offer-in-compromise that Mr. Lanier had prepared, in which he offered to satisfy for $23,121.40 his 1987 through 1989 tax liability (1987 through 1989 amended offer), which totaled $72,807.59. On the same date, Mr. Kayian, Sr. and Ms. Livingston signed, under penalties of perjury, an amended offer-in-compromise that Mr. Lanier had prepared, in which they offered to satisfy for the same $23,121.40 their joint 1990 and

1991 tax liability (1990-1991 amended offer), which totaled $18,854.93. A document entitled collateral agreement was attached to each of those amended offers-in-compromise. Each such document stated in pertinent part:

> I, Harry K. Kayian Sr, submitted an amended offer dated 12/07/92 in the amount of $23121.40 to compromise an unpaid Federal Income tax liability, plus statutory additions, for the period ended December 31, 1987, December 31, 1988, and December 31, 1989.
>
> We, Harry K. Kayian Sr & Nancy L. Kayian, submitted an amended offer dated 12/07/92 in the amount of $23121.40 to compromise an unpaid joint Federal Income tax liability, plus statutory additions, for the period ended December 31, 1990, and December 31, 1991.
>
> The purpose of this letter is to amend those offers by adding the following provision:
>
>> One payment of $23121.40 shall satisfy all offer payment requirements as to the total sum paid in full with respect to all offers described herein. This agreement is contingent upon the acceptance of the above referenced offers. [Reproduced literally.]

The 1987 through 1989 amended offer and the 1990-1991 amended offer gave the following response to a question which requested the taxpayer to state the reasons why each such offer should be accepted: "I cannot pay these taxes."

Mr. Lanier sent Mr. Stephens the 1987 through 1989 amended offer and the 1990-1991 amended offer under a transmittal letter dated December 8, 1992. That transmittal letter stated in pertinent part: "The new Offers are for a total of $23,121.40 in settlement of all income taxes, interest, and penalties for 1987,

1988, 1989, 1990, and 1991."  Mr. Stephens reviewed the foregoing amended offers-in-compromise.  Based on the value of all of the assets disclosed in Mr. Kayian, Sr.'s Form 433-A, discussions with Mr. Kayian, Sr. and Mr. Lanier, and Mr. Stephens' independent investigation of Mr. Kayian, Sr.'s financial situation, Mr. Stephens prepared what the Service refers to as a reasonable collection potential computation.  Such a computation is used to ascertain the reasonable collection potential of a taxpayer who has submitted an offer-in-compromise to the Service.  In preparing that reasonable collection potential computation with respect to Mr. Kayian, Sr., Mr. Stephens did not include the value of the Aruba bonds or any other assets or interests which Mr. Kayian, Sr. owned but which were not disclosed in Mr. Kayian, Sr.'s Form 433-A or in discussions with Mr. Kayian, Sr. and Mr. Lanier.

Based on the information provided by Mr. Kayian, Sr. and Mr. Lanier, Mr. Stephens concluded that there existed a doubt as to the collectability of Mr. Kayian, Sr.'s 1987 through 1989 tax liability and Mr. Kayian, Sr. and Ms. Livingston's joint 1990 and 1991 tax liability and that an acceptable offer-in-compromise of Mr. Kayian, Sr.'s 1987 through 1991 tax liability was $23,121.40. On December 11, 1992, Mr. Stephens recommended to his supervisor that the Service accept the 1987 through 1989 amended offer and the 1990-1991 amended offer.  If Mr. Stephens had known of the

existence of the Aruba bonds, he would not have made that rec-
ommendation.  Instead, he would have requested that Mr. Kayian,
Sr. liquidate those bonds and use the bond proceeds toward
satisfaction of his outstanding tax liability.  Mr. Stephens'
supervisor rejected Mr. Stephens' recommendation that the Service
accept the 1987 through 1989 amended offer and the 1990-1991
amended offer.

In a letter dated December 21, 1992, Mr. Lanier wrote to Mr.
Stephens concerning a proposed examination of Mr. Kayian, Sr.'s
returns for 1988 and 1989.  That letter stated:  "It just seems
pointless to go through with the examination because there are no
more assets available to pay any additional taxes."  On June 8,
1993, Mr. Kayian, Sr. withdrew the 1987 through 1989 amended
offer and the 1990-1991 amended offer.

Mr. Kayian, Sr. executed under oath a financial affidavit
dated March 18, 1993 (financial affidavit), with respect to a
lawsuit that his former spouse Beatrice Kayian (Beatrice Kayian
lawsuit) commenced against him in the family law division of the
Circuit Court of the 13th Judicial Circuit in and for Hills-
borough County, Florida (13th Circuit Court).  In that affidavit,
Mr. Kayian, Sr. represented, inter alia, (1) that he had monthly
expenses of $2,680 which exceeded his monthly income of $2,200,
(2) that the aggregate value of the mortgage notes that he owned

on certain time-shares was $65,000, (3) that the aggregate value of the Key West condominiums that he owned was $120,000, and (4) that the liabilities on those two properties totaled $82,000. Mr. Kayian, Sr. did not disclose the Aruba bonds or his 1987 through 1991 tax liability in the financial affidavit.

On or about April 29, 1993, Mr. Kayian, Sr. executed and filed in the Beatrice Kayian lawsuit a notice that he had served answers to interrogatories which Beatrice Kayian had served on him on January 20, 1993. In those answers, Mr. Kayian, Sr. did not disclose the existence of the Aruba bonds, but did disclose, inter alia, (1) that he owned the two Key West condominiums, (2) that he owned the mortgage notes on certain time-shares, (3) that he had one insurance policy with Continental, (4) that he had one bank account with a balance of $300 from which Ms. Livingston was authorized to withdraw funds, (5) that he had an aggregate tax liability for 1987 through 1991 in the amount of $86,636.66, and (6) that he was making monthly payments to four creditors as follows: $1,000 per month to the Service and $250 per month to each of three banks which had issued credit cards to him.

On or about August 6, 1993, Ms. Livingston checked Mr. Kayian, Sr. into a hospital because he was having trouble breathing. Ms. Livingston called Mr. Kayian, Jr. on the following day and informed him that she was leaving Tampa, although she had not

told Mr. Kayian, Sr. of her plans to leave. About two or three days later, Mr. Kayian, Jr. told his father that Ms. Livingston had left Tampa.

On a date not disclosed by the record between around August 7, 1993, and around August 14, 1993, the hospital released Mr. Kayian, Sr. for a couple of days. Mr. Kayian, Jr. accompanied his father to his father's residence and retrieved the mail for him. That mail included a Social Security check in the amount of $12,000 (Social Security check) and a check from Aruba with respect to the Aruba bonds. The Social Security check was in such a large amount because Mr. Kayian, Sr. had applied late for his Social Security benefits and past due benefits were included in that check.

After a few days at home, Mr. Kayian, Sr. was readmitted to the hospital. On August 16, 1993, the day before he died, Mr. Kayian, Sr. executed a durable power of attorney authorizing Mr. Kayian, Jr. to act on his behalf. By letter dated August 16, 1993, which he did not sign, Mr. Kayian, Sr. requested Continental to change the beneficiary of his Continental group life insurance policy to Mr. Kayian, Jr. for "FINAL EXPENSES". Mr. Kayian, Sr.'s Continental group life insurance policy had a death benefit of $10,000 and was to pay interest from date of death. By separate letter dated August 16, 1993, which he did not sign, Mr. Kayian, Sr. requested Continental to change the beneficiary

of his Continental annuity contract to his grandsons Nicholaus Kayian and Kenneth John Kayian-Beck and his granddaughter Kaitlynn Elizabeth Kayian.  Mr. Kayian, Sr.'s Continental annuity contract had a cash surrender value of at least $14,000 and was to pay interest from date of death.  By letter dated August 16, 1993, which he did not sign, Mr. Kayian, Sr. requested Jackson National to change the beneficiary of his Jackson National annuity contract to his grandsons Nicholaus Kayian and Kenneth John Kayian-Beck and his granddaughter, Kaitlynn Elizabeth Kayian.  Mr. Kayian, Sr.'s Jackson National annuity contract had an accumulation value and death benefit of $59,262.39.  Mr. Kayian, Jr. and Robert Kayian signed each of the foregoing letters as witnesses.

Also on or about August 16, 1993, Mr. Kayian, Sr. transferred to Mr. Kayian, Jr. (initial transfer) the Aruba bonds valued at $70,000 and the Social Security check for $12,000 (collectively, transferred properties) and directed him to distribute the transferred properties to Mr. Kayian, Sr.'s children and grandchildren (Mr. Kayian, Sr.'s directions).  Mr. Kayian, Sr. made the initial transfer for no consideration and without an exchange of reasonably equivalent value.  When Mr. Kayian, Sr. made the initial transfer, he was well aware, and Mr. Kayian, Jr. was aware generally, of Mr. Kayian, Sr.'s 1987 through 1991 tax liability, and Mr. Kayian, Sr. was bound to know

that the Service would levy on his property in order to collect that liability. At the time Mr. Kayian, Sr. made the initial transfer, he was bound to know that he had incurred substantial medical expenses since he entered the hospital on August 6, 1993.

After Mr. Kayian, Sr. made the initial transfer, Mr. Kayian, Jr., pursuant to Mr. Kayian, Sr.'s directions, (1) distributed for no consideration and without an exchange of reasonably equivalent value a portion of the transferred properties valued at $10,933.33 to (a) each of Mr. Kayian, Sr.'s remaining sons (viz., petitioner Robert Kayian, Kenneth V. Kayian, and Richard H. Kayian), (b) his daughter (viz., Karen Kayian Aubel), and (c) two of his three grandchildren (viz., Kenneth J. Kayian-Beck and Kaitlynn Elizabeth Kayian); (2) retained a portion of the transferred properties valued at $16,400 and divided that portion equally; and (3) distributed for no consideration and without an exchange of reasonably equivalent value one-half of that retained portion valued at $8,200 to Mr. Kayian, Sr.'s grandson (viz., Mr. Kayian, Jr.'s son, petitioner Nicholaus Kayian).

Although Ms. Livingston returned to Tampa on the day of Mr. Kayian, Sr.'s funeral, she did not attend that funeral. On that day, Ms. Livingston withdrew all of the funds from the joint bank accounts that she had with Mr. Kayian, Sr. She previously had taken Mr. Kayian, Sr.'s Rolex wristwatch with her when she left

Tampa after he had been hospitalized.  Ms. Livingston subsequently sold that watch.

At a time not disclosed by the record after the initial transfer by Mr. Kayian, Sr. to Mr. Kayian, Jr., Mr. Kayian, Jr. contacted the issuer of the Aruba bonds about liquidating them. However, that issuer declined to do so at that time.  Instead, it made monthly payments to Mr. Kayian, Jr. with respect to the Aruba bonds over approximately five to seven months until those bonds were paid in full.

On October 21, 1993, Jackson National and Continental filed an interpleader action (interpleader action) in the U.S. District Court for the Middle District of Florida, Tampa Division (U.S. District Court), to determine the person or persons entitled to the proceeds of the Jackson National annuity contract, the Continental annuity contract, and the Continental group life insurance policy.  In September 1995, in a joint stipulation for entry of judgment and dismissal with respect to the interpleader action (settlement stipulation), Ms. Livingston, individually and as personal representative of Mr. Kayian, Sr.'s estate, withdrew all claims against Mr. Kayian, Jr. and Mr. Kayian, Sr.'s three grandchildren regarding those contracts.  In an order dated September 13, 1995, the U.S. District Court directed release of the interpled funds and ratified the settlement stipulation.

Although Ms. Livingston had agreed to have Mr. Lanier serve as personal representative of Mr. Kayian, Sr.'s estate in the probate proceeding involving that estate, he was not appointed as such because Mr. Kayian, Sr.'s family was unable to agree on how to handle that estate. On December 10, 1993, Ms. Livingston was appointed personal representative of Mr. Kayian, Sr.'s estate. In January 1994, probate of the intestate estate of Mr. Kayian, Sr. began (probate proceeding) in the probate division of the 13th Circuit Court (Probate Court). David M. Carr (Mr. Carr), an attorney, represented Ms. Livingston both in her capacity as personal representative of that estate and in her individual capacity.

At some undisclosed time prior to January 4, 1994, the two Key West condominiums that Mr. Kayian, Sr. had owned were at risk of foreclosure because the mortgage loans thereon were in default. A final judgment of foreclosure dated November 21, 1994, was entered by the Circuit Court of the 16th Judicial Circuit in and for Monroe County, Florida, with respect to one of those condominiums, and a supplemental summary judgment of foreclosure dated January 8, 1996, was entered by that court with respect to the remaining condominium.

By letter dated February 1, 1994, to John P. Holsonback, an attorney representing Mr. Kayian, Jr. in the probate proceeding, Mr. Carr, inter alia, made a formal demand that Mr. Kayian, Jr.

return the Aruba bonds, the $12,000 of Social Security benefits for which Mr. Kayian, Sr. received a check before he died, and any other assets of Mr. Kayian, Sr.'s estate in the possession of Mr. Kayian, Jr. At a time not disclosed by the record, Mr. Carr filed on behalf of Mr. Kayian, Sr.'s estate a complaint in the Probate Court commencing an action against Mr. Kayian, Jr. to recover certain property of Mr. Kayian, Sr. in the possession of Mr. Kayian, Jr., including the Aruba bonds, any cash representing proceeds from the sale of such bonds, bank accounts, and other property.

Ms. Livingston, in her capacity as personal representative of Mr. Kayian, Sr.'s estate, filed in the probate proceeding an inventory of the assets of that estate, dated March 24, 1994 (inventory). That inventory listed, inter alia, the following properties of Mr. Kayian, Sr.'s estate that were in the possession, control, or knowledge of Ms. Livingston and the following estimated fair market values of such properties: (1) the two Key West condominiums valued at $64,000; (2) the mortgage notes on certain time-shares valued at $53,244.45; (3) proceeds held by Mr. Lanier in the amount of $9,415.08; (4) the Aruba bonds valued at $70,000, with a notation that Ms. Livingston was currently investigating the value of those bonds and that the value might be reduced to $60,000; (5) the Jackson National annuity contract and the Continental annuity contract valued at

$59,262.39 and $14,000, respectively; and (6) the Continental group life insurance policy valued at $10,000. Ms. Livingston included the following statement regarding the two Key West condominiums that were listed in the inventory:

> The beneficiaries have advised the Personal Representative that a judgment has been entered against the decedent that would act as a lien against these properties and reduce the equity to zero. Additionally, the IRS may have a lien against the equities of these properties.

Ms. Livingston filed in the probate proceeding a statement regarding creditors that she executed on March 24, 1994. To that statement was attached a schedule of creditors which showed

> the names and, if known, the addresses of all persons ascertained to have claims or demands against the estate and who have not filed a timely claim, or who have not had their claim included in a Personal Representative's Proof of Claim filed in this proceeding * * *.

The schedule of creditors listed the following creditors: (1) Emergency Physicians - Brandon, (2) Brandon Hospital, (3) Smith Kline Beecham Clinical Lab., (4) Ruffolo, Hooper & Assoc., M.D., P.A., (4) Lewis E. Auerbach, M.D., (5) Drs. Sheer, Ahean & Associates, (6) World Omni Financial Corporation, (7) NationsBank, (8) Barnett Mortgage Company, (9) Citicorp Credit Services, (10) Pulmonary Associates of Brandon, (11) Brandon Diagnostic Center, (12) Bank of New York, (13) First Union Bankcard, and (14) Internal Revenue Service.

On July 1, 1994, the Service filed a proof of claim in the probate proceeding for unpaid, assessed taxes owed by Mr. Kayian, Sr. in the total amount of $79,282.33. The Service's claim was not paid in the probate proceeding.

On February 20, 1995, Mr. Carr filed a petition for attorney's fees in the probate proceeding. On March 17, 1995, the Probate Court issued an order with respect to that petition, which "awarded a partial attorney's fee" of $19,287.40 for the work that Mr. Carr had performed on behalf of Mr. Kayian, Sr.'s estate and reasonable costs of $1,473.64, both of which the Probate Court directed be paid from the assets of Mr. Kayian, Sr.'s estate. That order further stated that "this award of attorney's fees does not include any statutory percentage to which" Mr. Carr is entitled.

On March 22, 1995, the Probate Court issued an order in the probate proceeding approving, adopting, and ratifying the stipulation and settlement agreement that had been entered into among Ms. Livingston, individually and as personal representative of Mr. Kayian, Sr.'s estate, and Robert Kayian, Kenneth V. Kayian, Richard H. Kayian, and Karen Kayian Aubel. That stipulation and settlement agreement, inter alia, provided that Ms. Livingston and Mr. Kayian, Sr.'s estate agreed to withdraw claims against the interests of Robert Kayian, Kenneth V. Kayian, Richard H. Kayian, and Karen Kayian Aubel with respect to the transferred

properties but not with respect to the interests of Mr. Kayian, Jr. and his son Nicholaus Kayian with respect to those properties.

On November 2, 1995, Mr. Carr filed a notice of final accounting and petition for discharge in the probate proceeding. That notice showed that most of the distributions and disbursements of Mr. Kayian, Sr.'s estate were made to pay Ms. Livingston a family allowance as well as fees as personal representative of Mr. Kayian, Sr.'s estate, attorney's fees, accounting fees, and other costs and expenses. On December 5, 1995, the Probate Court issued an order in the probate proceeding discharging Ms. Livingston as the personal representative of Mr. Kayian, Sr.'s estate.

Respondent issued separate notices of transferee liability to petitioner Robert Kayian and petitioner Nicholaus Kayian, respectively, in which respondent determined that they are liable as transferees in amounts not exceeding $10,933 and $8,200, respectively, plus interest thereon as provided by law, for Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability.

OPINION

We shall first address certain evidentiary matters. At trial, we admitted into evidence conditionally, subject to our ruling on admissibility, certain evidence to which respondent objected.

Respondent objects to the admission into evidence of paragraph 72 (stipulation 72) and the exhibit referenced therein and paragraph 73 (stipulation 73) and the exhibit referenced therein of the supplemental stipulation of facts that the parties filed in these cases. The ground for respondent's objections is that those matters are inadmissible under rule 408 of the Federal Rules of Evidence (FRE 408). Petitioner concedes on brief, and we find, that stipulation 73 and the exhibit referenced therein are inadmissible under FRE 408. Consequently, that stipulation and that exhibit shall be deemed stricken from the record in these cases.

Stipulation 72 describes the exhibit attached thereto. That exhibit is a stipulation prepared by the United States (bankruptcy stipulation) in a bankruptcy proceeding that Mr. Kayian, Jr. had commenced (Mr. Kayian, Jr.'s bankruptcy proceeding). In that bankruptcy stipulation, the United States agreed to withdraw a claim of transferee liability against Mr. Kayian, Jr. with respect to Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability.

FRE 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of

> any evidence otherwise discoverable merely because it
> is presented in the course of compromise negotiations.
> This rule also does not require exclusion when the
> evidence is offered for another purpose, such as prov-
> ing bias or prejudice of a witness, negativing a con-
> tention of undue delay, or proving an effort to ob-
> struct a criminal investigation or prosecution.

Respondent argues that the bankruptcy stipulation is evidence of a compromise by the United States in Mr. Kayian, Jr.'s bankruptcy proceeding, which petitioners in the instant cases want to use to establish that respondent's determinations against them are not valid. Consequently, according to respondent, that evidence is inadmissible under FRE 408.

Petitioners argue that FRE 408 "does not apply to final judgments in judicial proceedings" and that "because stipulations entered in prior court proceedings have the preclusive effect of final judgments, they are admissible in subsequent proceedings to prove liability for, or invalidity of, the claim that is the subject of the stipulation." In support of their position, petitioners rely on In re Cluck, 165 Bankr. 1005 (W.D. Tex. 1993), affd. without published opinion 20 F.3d 1170 (5th Cir. 1994), and In re Camp, 170 Bankr. 610 (Bankr. N.D. Ohio 1994).

We find In re Cluck, supra, and In re Camp, supra, on which petitioners rely to be distinguishable from the instant cases and their reliance on them to be misplaced. Moreover, in each of those cases, 11 U.S.C. sec. 505(a)(2)(A) (1994), prevented the Bankruptcy Court from relitigating the debtor's tax liability for

a particular taxable year after this Court had made a determination with respect to that debtor's tax liability.

We agree with respondent that stipulation 72 and the exhibit referred to therein are inadmissible under FRE 408. The Advisory Committee's Note to FRE 408 states in pertinent part: "While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto." 56 F.R.D. 183, 226 (1973). Stipulation 72 and the exhibit referenced therein are evidence of a completed compromise. Each petitioner claims that his liability as a transferee "depends on Harry Kayian, Jr.'s status as a transferee, and because the government is now barred from asserting transferee liability against him, Petitioners can have no liability." Thus, petitioners are attempting to use stipulation 72 and the exhibit referenced therein to establish the invalidity of respondent's determinations that petitioners are liable as transferees. We conclude that that evidence is inadmissible under FRE 408. Consequently, stipulation 72 and the exhibit referenced in that stipulation shall be deemed stricken from the record in these cases.[3]

---

[3]On brief, respondent makes no argument about the admissibility of the testimony of Philip Doyle (Mr. Doyle), the attorney who represented the United States in Mr. Kayian, Jr.'s bankruptcy
(continued...)

We shall now address the transferee liability issues presented in these cases.  Respondent bears the burden of showing that each petitioner is liable as a transferee of property of Mr. Kayian, Sr., but not that Mr. Kayian, Sr. was liable for Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability.  See sec. 6902(a); Rule 142(d).

Section 6901 provides in pertinent part:

> (a)  Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
>
> (1) Income, estate, and gift taxes.--

---

[3](...continued)
proceeding and who was responsible for preparation of the bankruptcy stipulation.  We admitted Mr. Doyle's testimony into evidence conditionally, subject to our ruling on the admissibility of stipulation 72 and stipulation 73 and the exhibits referenced therein.  On brief, petitioners concede that Mr. Doyle's testimony is inadmissible.  We conclude that Mr. Doyle's testimony, like stipulation 72 and stipulation 73 as well as the respective exhibits referenced therein, is inadmissible under FRE 408.  Accordingly, Mr. Doyle's testimony shall be deemed stricken from the record in these cases.

Assuming arguendo that stipulation 72 and stipulation 73 and the exhibits referenced in those stipulations were admissible, Mr. Doyle's testimony also would be admissible.  That testimony, if admitted into the instant record, would establish that the United States was willing to enter into the bankruptcy stipulation because it concluded that it had not timely filed in the bankruptcy proceeding its claim against Mr. Kayian, Jr. that he is liable as a transferee of Mr. Kayian, Sr.'s outstanding tax liability.  Even if we had ruled differently on the evidentiary matters addressed herein, such a ruling would not have affected our conclusions with respect to the transferee liability issues in these cases.

       (A) Transferees.--The liability, at law or in equity, of a transferee of property--

         (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

    \*     \*     \*     \*     \*     \*     \*

       (h) Definition of Transferee.--As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee \* \* \*.

The courts have recognized that section 6901 does not create or define a substantive liability, but merely provides a procedure by which the Government may collect from a transferee of property unpaid taxes owed by the transferor of the property. Commissioner v. Stern, 357 U.S. 39, 42 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993). The existence and extent of a transferee's liability is determined under applicable State law. See Commissioner v. Stern, supra at 42-45; Hagaman v. Commissioner, supra at 183-185. The parties agree that the applicable State law in these cases is the law of the State of Florida. Petitioners argue, however, that under applicable Florida law respondent must establish by clear and convincing evidence, and not merely by a preponderance of the evidence, that petitioners are liable as transferees. Respondent counters that under applicable Florida law the standard of proof is a preponderance of the evidence. We agree with respondent. See

Watson Realty Corp. v. Quinn, 452 So. 2d 568 (Fla. 1984) (per curiam).

Petitioners maintain that Mr. Kayian, Jr. is the initial transferee of certain assets of Mr. Kayian, Sr. and that they received certain of those assets from Mr. Kayian, Jr.  Petitioners further maintain that "if Petitioners are liable for any portion of * * * [Mr. Kayian, Sr.'s 1987-1989] unpaid income tax liabilities, it is as transferees of a transferee [Mr. Kayian, Jr.]."  According to petitioners,

> It is the initial transfer, from Transferor [Mr. Kayian, Sr.] to Harry Kayian, Jr., that must be examined to determine whether Harry Kayian, Jr. was a transferee "at law or in equity".  If he was a transferee at law or in equity, then Petitioners may be held liable, as transferees of a transferee, to the extent of the assets of * * * [Mr. Kayian, Sr.] that they received.

Respondent argues that whether petitioners received the transferred properties as transferees of a transferor (Mr. Kayian, Sr.) or as transferees of a transferee (Mr. Kayian, Jr.) is irrelevant for purposes of determining their respective liabilities in these cases.  Respondent further contends

> that the record in this case [sic] supports a finding that Harry Kayian, Jr., while himself a transferee, was a conduit complying with his father's direct instructions that he was transferring his property to his children and grandchildren via his son present at the time, Harry Kayian, Jr., who was also the eldest child. * * * Accordingly, the record supports a finding that each recipient of the transferred property was a direct transferee of the transferor Harry Kayian, Sr., rather than a transferee of a transferee, Harry Kayian, Jr.

On the record before us, we agree with respondent and find that petitioners are the direct transferees from Mr. Kayian, Sr. of the respective portions of the transferred properties that they received.  Nevertheless, we shall examine only the initial transfer from Mr. Kayian, Sr. to Mr. Kayian, Jr., as petitioners request, since our examination of that transfer resolves the transferee liability issues in these cases.

The parties agree that, in determining whether Mr. Kayian, Jr. is a transferee at law or in equity, and therefore whether petitioners are liable as transferees for Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability, we must consider the application of the fraudulent conveyance law of Florida set forth in (1) Fla. Stat. Ann. sec. 726.105 (West 1988) (Fla. Stat. Ann. sec. 726.105 or Florida fraudulent transfer statute) and (2) Fla. Stat. Ann. sec. 726.106 (West 1988) relating to constructively fraudulent transfers.  We shall address only the applicability of the Florida fraudulent transfer statute to the initial transfer because our consideration of that statute disposes of the transferee liability questions presented.

The Florida fraudulent transfer statute provides in pertinent part:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; * * *

        *    *    *    *    *    *    *

(2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the

> debtor.  [Fla. Stat. Ann. sec. 726.105(1) and
> (2).]

The language of the Florida fraudulent transfer statute makes it clear that, in determining whether a transfer is made with the actual intent to hinder, delay, or defraud any creditor of the debtor (fraudulent intent), we may consider factors (badges of fraud) other than those set forth in Fla. Stat. Ann. sec. 726.105(2)(a) through (k).  See Fla. Stat. Ann. sec. 726.105(2); see also General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1498 (11th Cir. 1997).  Moreover, in determining whether a transfer is made with a fraudulent intent, we must "take into account 'the particular facts surrounding the conveyance,' and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor."  Id. at 1498-1499 (quoting Kirk v. Edinger, 380 So. 2d 1336, 1337 (Fla. Dist. Ct. App. 1980)).  Furthermore, although a "single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, * * * several of them when considered together may afford a basis to infer fraud."  Id. at 1498 (quoting Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992)).  We have recognized that

> In Florida, existing creditors have the benefit of
> a presumption of fraudulent intent where the conveyance
> is voluntary [i.e., for no consideration] and there is

a close relationship between the transferor and the transferee.

Hagaman v. Commissioner, 100 T.C. at 188-189; see Advest, Inc. v. Rader, 743 F. Supp. 851, 854 (S.D. Fla. 1990).

Petitioners concede (1) that there was a close relationship (father/son) between Mr. Kayian, Sr. and Mr. Kayian, Jr., see Fla. Stat. Ann. sec. 726.105(2)(a); (2) that the initial transfer was for no consideration, Fla. Stat. Ann. sec. 726.105(2)(h); (3) that "Florida law permits courts to indulge in a presumption that the presence of these two particular badges of fraud, i.e., a transfer of assets to a family member for no consideration, are evidence of actual intent to hinder, delay or defraud creditors", see Hagaman v. Commissioner, supra at 188-189; Advest, Inc. v. Rader, supra at 854; and (4) that petitioners bear the burden of rebutting any such presumption, see Hagaman v. Commissioner, supra; Advest, Inc. v. Rader, supra.  We find on the record in these cases that a presumption exists under the Florida fraudulent transfer statute that Mr. Kayian, Sr. made the initial transfer with a fraudulent intent.

Petitioners contend that if we were to find under the Florida fraudulent transfer statute that a presumption exists that Mr. Kayian, Sr. made the initial transfer with a fraudulent intent, they have rebutted such a presumption.  According to petitioners,

Harry Kayian, Sr. was a victim of lung cancer. On or about August 6, 1993, his wife, Nancy Livingston, took Transferor [Mr. Kayian, Sr.] to the hospital because he was having trouble breathing. Instead of staying with Transferor for his final days, she went home, packed her things, called his son, Harry Kayian, Jr., to tell him she was leaving town, and she departed. When Harry Kayian, Jr. told his father, the Transferor, that his wife was gone, it broke his father's heart. A few days later, the Transferor, knowing he had no will and knowing he was near death, had a long discussion with his sons, Harry, Jr. and Robert about his wife's departure. During that conversation, Transferor told his sons that he wanted to leave a small legacy for each of his chilren [sic] and grandchildren. He told them that he was giving his Aruba retirement bond, in bearer form, and a social security check that he recently received, to Harry, Jr. to divide among Transferor's children and grandchildren. He stated that he did not want his wife to receive those assets because she deserted him in his final days * * *. Transferor's sole intention was to leave his children and grandchildren a small legacy that his estranged wife could not reach. The following day, the Transferor died.

At the time of the transfer to Harry Kayian, Jr., more than two years had elapsed since the Transferor incurred his tax obligations. Approximately one year had elapsed since he contracted lung cancer. Yet he had transferred no assets to his children or grandchildren during that period. It was only when his wife left him to die, alone, that he made this transfer.

* * * Surely, these facts, surrounding this particular transfer, show the Transferor's intent in making the transfer and negate any possible inference or presumption that this transfer was made to hinder, delay or defraud creditors. The Transferor made this transfer for the sole purpose of insuring that each of his children and grandchildren would receive a small legacy that his estranged wife could not get.

Respondent counters that

the actual intent of Harry Kayian, Sr. is best determined based on the entire record in this case [sic]

which evidences Harry Kayian, Sr.'s consistent intent to evade payment of taxes over a period of years concluding with the [initial] transfer on August 16, 1992 [sic]. As early as 1986, years prior to the transfer, Harry Kayian, Sr. had decided not to pay his income taxes and to take any affirmative steps necessary to evade such payment, including hiding assets, lying to his return-preparer and to the government and preparing and executing false financial statements under oath, for submission to the government and to the courts. * * * The [initial] transfer on August 16, 1992 [sic], was one more step in furtherance of and consistent with Harry Kayian, Sr.'s intent to evade payment of his taxes. Petitioners have not shown that Harry Kayian, Sr.'s "sole intention" in effecting the subject transfers was to provide a legacy for his heirs. Even if Harry Kayian, Sr. had made the transfers with a desire to provide a legacy for his heirs, such an intention is consistent with the proof in this case [sic] of his actual intent to hinder, delay, or defraud the government's attempts to collect the transferred property to satisfy his tax liabilities and, [sic] does not negate the proof of such intent to hinder, delay, or defraud. Cf. United States v. Southland Corp., 760 F.2d 1366, 1373 (2d Cir.), cert. denied, 474 U.S. 825 (1985) (citation omitted) (in the context of criminal intent to defraud the government, one cannot escape liability by showing that the intent to defraud "was merely incidental to some other action which constituted the primary motivation").

To support their position about Mr. Kayian, Sr.'s intent in making the initial transfer, petitioners rely on the testimony of Ms. Livingston and Mr. Kayian, Jr. Based on the record in these cases and our observation of those witnesses, we believe that there are ill feelings and an adversarial relationship between Ms. Livingston and Mr. Kayian, Jr. We have serious reservations about the reliability of material aspects of the testimony of Ms. Livingston and the testimony of Mr. Kayian, Jr., and we shall not

rely on the testimony of either witness to establish, inter alia, Mr. Kayian, Sr.'s intent in making the initial transfer.[4]  On the record before us, we find that petitioners have failed to establish that Mr. Kayian, Sr.'s "sole intention was to leave his children and grandchildren a small legacy that his estranged wife could not reach."

Assuming arguendo that petitioners had established that a motive of Mr. Kayian, Sr. in giving the transferred properties to Mr. Kayian, Jr. was to ensure that Mr. Kayian, Sr.'s children and grandchildren, and not Ms. Livingston, received those properties, we nonetheless find on the instant record that petitioners have failed to rebut the presumption which we have found exists under the Florida fraudulent transfer statute that Mr. Kayian, Sr. made that transfer with a fraudulent intent.  In so finding, we have given consideration not only to the badges of fraud (viz., the initial transfer was made to an insider, see Fla. Stat. Ann. sec. 726.105(2)(a), and for no consideration, see Fla. Stat. Ann. sec. 726.105(2)(h)) which give rise to that presumption, but also to other badges of fraud established by the record in these cases,

---

[4]We note that although petitioners claim that Mr. Kayian, Sr. "had a long discussion with his sons, Harry, Jr. and Robert [one of the petitioners herein] about his wife's departure", they did not call petitioner Robert Kayian as a witness at the trial in these cases.

including the following:[5] (1) On July 20, 1992, due to the failure of Mr. Kayian, Sr. to pay in full his 1987-1989 tax liability, the Service recorded a notice of Federal tax lien in an amount totaling $68,243.27 in Hillsborough County, Florida. On September 4, 1992, Mr. Stephens sent Mr. Kayian, Sr. a final notice of intention to levy with respect to the respective taxes that were shown due in the 1990 and 1991 joint returns that Mr. Kayian, Sr. and Ms. Livingston had submitted to the Service. On June 8, 1993, Mr. Kayian, Sr. withdrew his 1987 through 1989 amended offer-in-compromise and his and Ms. Livingston's 1990-1991 amended offer-in-compromise. At the time of the initial transfer, Mr. Kayian, Sr. was well aware (and Mr. Kayian, Jr. was aware generally) of Mr. Kayian, Sr.'s 1987 through 1991 tax liability, and Mr. Kayian, Sr. was bound to know that the Service would levy on his property in order to collect that liability. See Fla. Stat. Ann. sec. 726.105(2)(d). (2) Mr. Kayian, Sr. did not disclose in Mr. Kayian, Sr.'s Form 433-A or in discussions with the Service that he owned the Aruba bonds. Nor did he disclose in that form or those discussions that he was receiving payments with respect to those bonds, which started around August

---

[5]It is noteworthy that a number of the badges of fraud identified in the Florida fraudulent transfer statute could have no application here because Mr. Kayian, Sr. died the day after he made the initial transfer of the transferred properties to Mr. Kayian, Jr.

1992 when the Service was attempting to collect Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability as well as Mr. Kayian, Sr. and Ms. Livingston's joint 1990 and 1991 tax liability.[6] Mr. Kayian, Sr. thus concealed assets from the Service.[7] See Fla. Stat. Ann. sec. 726.105(2)(g). (3) Although Mr. Kayian, Sr.'s liability for tax due for each of the years 1987 through 1989 arose on the date on which his return for each such year was required to be filed, Mr. Kayian, Sr.'s tax liability for each of those years was not quantified until after the Service summoned him in early February 1992 with respect to his taxable years 1987 through 1989 and he prepared and submitted to the Service returns for those years on March 2, 1992, March 30, 1992, and April 13, 1992, respectively. Those returns showed taxes due, and respondent assessed those taxes, plus applicable additions to tax and interest, on May 4, 1992, May 18, 1992, and June 1, 1992, respectively. In addition, on June 5, 1992, and July 7, 1992, respectively, Mr. Kayian, Sr. and Ms. Livingston submitted to the Service joint returns for 1990 and 1991, which showed taxes due. When Mr. Kayian, Sr. gave the transferred properties to Mr. Kayian, Jr., he was well aware

---

[6]On the record before us, we reject petitioner's contention that Mr. Kayian, Sr. did not disclose the Aruba bonds to the Service because he thought those bonds were worthless.

[7]It is also noteworthy that in answers to interrogatories and in a financial affidavit, both of which he prepared with respect to the Beatrice Kayian lawsuit, Mr. Kayian, Sr. did not disclose that he owned the Aruba bonds.

of his 1987 through 1991 tax liability, and he was bound to know that the Service would levy on his property in order to collect that liability. Moreover, at the time of the initial transfer, Mr. Kayian, Sr. was bound to know that he had incurred substantial medical expenses since he entered the hospital on August 6, 1993. Indeed, in a statement regarding creditors that Ms. Livingston filed in the probate proceeding around the end of March 1994, many of the creditors that she listed were physicians and medical facilities. See Fla. Stat. Ann. sec. 726.105(2)(j). (4) The effect of Mr. Kayian, Sr.'s having made the initial transfer was, at a minimum, to hinder and delay and, at a maximum, to avoid the collection by the Service of Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability. See General Trading Inc. v. Yale Materials Handling Corp., 119 F.3d at 1498-1499 (The courts must "avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor.")

Based on our examination of the entire record in these cases, we find that respondent has established a presumption under the Florida fraudulent transfer statute that Mr. Kayian, Sr. made the initial transfer with a fraudulent intent within the meaning of that statute and that petitioners have failed to rebut that presumption.[8] We hold that Robert Kayian and Nicholaus

---

[8]Even without regard to the presumption established on the
(continued...)

Kayian are liable as transferees in amounts not exceeding $10,933
and $8,200, respectively, plus interest therein as provided by
law, for Mr. Kayian, Sr.'s 1987-1989 unpaid tax liability.

To reflect the foregoing,

<u>Decisions will be entered
for respondent</u>.

---

[8](...continued)
instant record by the Florida fraudulent transfer statute, we
find on that record that Mr. Kayian, Sr. made the initial trans-
fer with a fraudulent intent within the meaning of the Florida
fraudulent transfer statute.  In making our various findings
under the Florida fraudulent transfer statute, we have considered
all of the arguments and contentions of petitioners with respect
to that statute that are not addressed herein, and we find them
to be without merit.